301 Ga. 272
FINAL COPY

S17A0296. STEPLIGHT v. THE STATE.

HINES, Chief Justice.

Samuel Steplight appeals his convictions and sentences for felony murder, possession of a knife during the commission of a crime, and terroristic threats, all in connection with the death of Norma Jean Mobley.  For the reasons that follow, we affirm in part and reverse in part.[1]

Construed to support the verdicts, the evidence showed that Steplight and Mobley had a romantic relationship, with Steplight living in Mobley's home until the relationship ended in early October 2010, at which point Steplight moved out.  A week later, Moses Slaughter began to live in Mobley's home;

---

[1] The crimes occurred on November 3, 2010.  On January 25, 2011, a Richmond County grand jury indicted Steplight for malice murder, felony murder while in the commission of aggravated assault, possession of a knife during the commission of a crime, and terroristic threats. Steplight was tried before a jury October 3-6, 2011, and found not guilty of malice murder, but guilty of all other charges; on November 18, 2011, Steplight was sentenced  to life in prison without the possibility of parole for felony murder, and consecutive sentences of five years in prison for possession of a knife during the commission of a crime and terroristic threats.  On November 28, 2011, Steplight filed a motion for new trial, which he amended on January 7, 2014; the motion, as amended, was denied on March 25, 2014.  Steplight filed a notice of appeal on April 8, 2014; his appeal was docketed in this Court for the term beginning in December 2016, and submitted for decision on the briefs.

Mobley had previously suffered a stroke and had no use of her left hand, had limited use of her left leg, and usually used a cane or other aid to walk.

On the night of October 24, 2010, Steplight went to a county law enforcement center, where he met a deputy sheriff; Steplight told the deputy that he had thoughts of killing Mobley and her "new man," as well as himself, and said that he wanted to go to the Veterans Administration Hospital for assistance. The deputy sheriff took Steplight to that hospital and left him with the hospital staff.

Shortly before noon on November 3, 2010, Mobley and a neighbor, LaGrand Grimes, walked to a nearby store. While Mobley was gone, Slaughter lay on a couch in the living room of Mobley's home; during that time, Steplight entered the dwelling through the unlocked kitchen door. Hearing the sounds of entry in the kitchen, Slaughter rose from the couch and went to the entryway between the kitchen and living room, where he encountered Steplight, who said: "My name is Sam. You're leaving here today one way or another." When Slaughter asked Steplight what he was doing in Mobley's home, Steplight brought his right hand from behind his back, and appeared to hold a .22 caliber pistol in it. Slaughter left Mobley's home, and shortly encountered her and

2

Grimes on their return from the store. Slaughter told them that Steplight was in Mobley's home, and Mobley called 911. When law enforcement officers arrived, they determined that Steplight was not in the home; Slaughter told Mobley to remain in the house with the doors locked, and he went to a county law enforcement center in an attempt to secure a restraining order against Steplight, or a warrant for his arrest, but he was unable to do so as paperwork from the law enforcement officers' visit had not yet been filed.

During Slaughter's absence, Mobley asked Grimes to go to the nearby home of David Campbell to see if Steplight was there. Grimes found Steplight at Campbell's home, and Steplight appeared to have been drinking; Campbell and another neighbor, Arthur Adams, were also there. Grimes heard Steplight say to her that, "if he can't have her no one can 'cause that's the man from the soup kitchen," which was a reference to Slaughter. Adams also heard Steplight "talking about if he couldn't have [Mobley] . . . wasn't nobody else going to have her." Grimes asked Steplight for Mobley's cell phone number which he supplied; she then left Campbell's home and telephoned Mobley, telling her that Steplight was at Campbell's residence.

After Slaughter was unable to secure a restraining order or warrant for

3

Steplight's arrest, he returned to Mobley's home, although the journey was lengthy, as he had to walk and take a bus; during the trip, he called Mobley's cell phone, but she did not answer. When he arrived at Mobley's home, he noticed a strange jacket on the back porch; inside the home, he found Mobley's body on the kitchen floor. Mobley had been fatally stabbed and cut with knife blades at least 15 times, suffering particularly injurious wounds to her chest; she also had slicing wounds to her palm and fingers of her right hand. In the kitchen sink were two bloody knives; a knife with a severely bent serrated blade, and an unserrated knife with a 5.5 inch blade. The jacket on the back porch contained a wallet with documents that identified Steplight. Later that night, Steplight went to a county law enforcement center and stated through an intercom at the front door that he wanted to turn himself in; by the time a clerk searched for warrants for him, and found none, Steplight had left. On November 6, 2010, he went to a law enforcement center and surrendered himself to an officer, saying that he had killed Mobley, and naming the street on which she had lived.

Steplight testified in his defense; he admitted to being Mobley's killer, and said that in the days before the killing, he met several times with Mobley, they resolved to renew their relationship, and Mobley stated that she would send

4

Slaughter away from her home. He further testified that: on November 3, 2010, he knocked on the door to Mobley's home, and she let him in; he and Mobley spoke for about five minutes; he inquired why she continued to allow Slaughter to live there after telling him they would get back together; he said "you been flip-flopping me"; she became nervous and went into the bedroom; Steplight heard clicks and the sound of a lighter, by which he concluded she was smoking crack cocaine; after she emerged from the bedroom and their conversation continued, she became "furious" and "wild," and "had a wild look in her eye"; Steplight decided to remove his possessions from the home, and put them on the street to embarrass Mobley; he began to remove the bed from the bedroom, stopped doing so, and started to leave the home; Mobley became belligerent and unfavorably compared his sexual prowess to that of Slaughter; she spat on him; he became "furiously mad"; he "just blanked out and . . . stabbed her and . . . stabbed her"; when the first knife he used to stab Mobley became bent and ineffective, he took a second knife and stabbed her several other times; and, after killing Mobley, he went to a nearby abandoned apartment for several hours, made an attempt to turn himself in to law enforcement officials, and then returned to the abandoned apartment.

1.  Steplight contends that the evidence was insufficient to authorize the jury to find him guilty beyond a reasonable doubt of the crime of terroristic threats.  See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).  He was charged with making terroristic threats "in reckless disregard of the risk of causing terror to . . . Mobley," based on his statements of November 3, 2010 expressing that if he could not "have her," he would not allow anyone else to.  See OCGA § 16-11-37.[2]   Pretermitting whether these statements qualify as threats under OCGA § 16-11-37, they were made to Grimes and Adams; the statements were not made to Mobley, were not made in her presence, and were not made in circumstances that would allow an inference that she would directly hear them.  However,

> [t]he crime of making terroristic threats focuses solely on the conduct of the accused and is completed when the threat is

---

[2] At the time of the alleged offense, OCGA § 16-11-37 read in pertinent part:
> (a) A person commits the offense of a terroristic threat when he or she threatens to commit any crime of violence, to release any hazardous substance, as such term is defined in Code Section 12-8-92, or to burn or damage property with the purpose of terrorizing another or of causing the evacuation of a building, place of assembly, or facility of public transportation or otherwise causing serious public inconvenience or in reckless disregard of the risk of causing such terror or inconvenience.  No person shall be convicted under this subsection on the uncorroborated testimony of the party to whom the threat is communicated.
> . . .

6

communicated to the victim with the intent to terrorize. [Cit.] That the message was not directly communicated to the victim would not alone preclude a conviction *where the threat is submitted in such a way as to support the inference that the speaker intended or expected it to be conveyed to the victim.* [Cit.]

*Armour v. State*, 265 Ga. App. 569, 571 (1) (594 SE2d 765) (2004) (Emphasis in original.)

But, the evidence does not support an inference that Steplight intended or expected his statements to be communicated to Mobley. He did not ask or direct anyone to convey his messages to Mobley, compare *Nassau v. State*, 311 Ga. App. 438 (715 SE2d 837) (2011), and there is no evidence to support the inference that he intended or expected that they would be. See *Stephens v. State*, 271 Ga. App. 509, 510 (610 SE2d 143) (2005). Although the State declares in its brief that "Grimes and Adams were both neighbors and acquaintances of the victim," the State did not present evidence that Steplight was aware of any relationships between them and Mobley such that they would be expected to repeat any threatening statements of Steplight's to Mobley, and thus presented no evidence that Steplight intended, or would expect, that his statements would

7

be conveyed to her;[3] Grimes and Adams did not live with Mobley and were not related to her, and the evidence presented would not lead to any inference that they would be expected, by virtue of their status as neighbors, to cause the messages to be conveyed to Mobley. Compare *Brown v. State*, 298 Ga. App. 545, 548 (680 SE2d 579) (2009) (The defendant's knowledge of the parameters of the attorney-client privilege allowed the inference that, when he made statements to his attorney that he would kill his wife and mother-in-law, he expected that the threats would be conveyed to them.); *Cobble v. State*, 268 Ga. App. 792, 793-794 (603 SE2d 86) (2004) (The defendant, while in custody for violating a protective order, told a law enforcement officer that, upon his release, he would kill the person protected by that order, circumstances which allowed the inference that the defendant expected that his threats would be communicated to the victim.) Without evidence to support an inference that Steplight intended or expected his statements to be conveyed to Mobley, his conviction for terroristic threats must be reversed. *Jackson*, supra; *Stephens*,

---

[3] Although the fact that Grimes requested that Steplight give her Mobley's cell phone number could suggest to him that Grimes would then convey the content of his statement to Mobley, that request occurred after Steplight had already made the statement which the State contends was a threat to Mobley.

supra.

Steplight does not contest the legal sufficiency of the evidence of his guilt as to the other charges. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record and concludes that the evidence at trial authorized the jury to find Steplight guilty beyond a reasonable doubt of the remaining crimes of which he was convicted. *Jackson*, supra.

2. The court instructed the jury regarding the law of voluntary manslaughter. OCGA § 16-5-2 (a).[4] Steplight contends that, in support of his assertion that he was provoked when Mobley became belligerent and spat upon him after she had smoked crack cocaine, he should have been permitted to introduce the testimony of a forensic toxicologist regarding the effect of cocaine on a person's behavior. "Such evidence is admissible when there is competent

---

[4] OCGA § 16-5-2 (a) reads:

A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

9

evidence of the effect asserted to have resulted from the chemicals found in the victim's system. [Cit.]" *Dunn v. State*, 292 Ga. 359, 361 (3) (736 SE2d 392) (2013).

Outside the jury's presence, Steplight proffered the forensic toxicologist's testimony that cocaine metabolites were found in Mobley's blood, and that such could cause a person to be euphoric, or to be aggressive and irritable, but that she could not testify how the drugs might have affected any particular person, and the court excluded the evidence as too speculative. Pretermitting whether this was competent evidence of the effect of Mobley's cocaine consumption on her behavior at the time she was stabbed, see id., considering the evidence presented, and the evidence excluded, any error in excluding the forensic toxicologist's testimony was harmless as it is highly probable that it did not contribute to the verdict. See *McWilliams v. State*, 280 Ga. 724, 727 (4) (632 SE2d 127) (2006). Steplight admitted that he stabbed Mobley repeatedly, and that, after the first knife he used to stab her bent so that it was ineffective, he secured another knife, and stabbed her several additional times. See id.

Judgments affirmed in part and reversed in part. All the Justices concur.

Decided May 30, 2017.

Murder. Richmond Superior Court. Before Judge Annis.

Johnny E. C. Vines, Brandi D. Payne, for appellant.

Ashley Wright, District Attorney, Joshua B. Smith, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.